KENNETH W. DONNELLY (*pro hac vice* pending)
Email:  donnellyk@sec.gov
Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4946
Facsimile: (202) 772-9282

LOCAL COUNSEL:
AMY J. LONGO (Cal Bar No. 198304)
Email: longoa@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>KAI CHRISTIAN PETERSEN; GIL BESERGLIK; and RAZ BESERGLIK,<br><br>Defendants,<br><br>SHRAGA HOLDINGS, LTD. and LEMBEX GLOBAL INVESTMENTS, LTD.,<br><br>Relief Defendants | Case No.  19-cv-08334<br><br>**COMPLAINT FOR INJUNCTION RELIEF AND OTHER REMEDIES**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

## <u>SUMMARY OF THE ACTION</u>

1.      This case involves the fraudulent and illegal offering and sale of more than $100 million of securities called "binary options" from at least October 2014 through August 2017 (the "Relevant Period").

COMPLAINT                                   1

2.     Kai Christian Petersen, Gil Beserglik and Raz Beserglik (collectively, the "Defendants") fraudulently offered and sold unregistered binary options through their operation and control of three Internet-based brokers acting under the names: (a) Bloombex Options (www.bloombex-options.com); (b) Morton Finance (www.mortonfinance.com); and (c) Starling Capital (www.starlingcapital.com) (collectively, the "Bloombex Brokers").  The Bloombex Brokers functioned through a combination of websites and marketing which mislead investors to invest in binary options, overseas call centers which applied boiler room tactics to manipulate investors into depositing substantial sums of money toward the purchase of binary options, and international companies which collected investor funds into overseas bank accounts and misappropriated investor funds.  Neither the websites, the brokers, the call centers, nor the companies ever registered with the SEC as a broker or dealer or were ever associated with a SEC-registered broker or dealer.

3.     The Defendants, through their various operations, used a series of deceptive devices and false and misleading statements in offering and selling binary options securities.  The Bloombex Brokers operated professionally-designed websites, complete with convincing trading platforms, to create the false impression that investors were entrusting their money to legitimate financial firms.  The websites falsely stated that professional brokers and financial experts would enable investors to earn large profits by trading in binary options.  After investors opened an account, the call centers then made materially false statements and engaged in other deceptive acts to complete the ruse.  Call centers employees, for example, falsely held themselves out as experienced brokers and advisors who would help investors to trade profitably.  They told investors that their clients typically made large sums by trading binary options, and told investors that they could withdraw their money (and profits) at any time.  The call centers then encouraged investors to make large deposits, oftentimes from credit cards and retirement and savings accounts.  They also falsely told investors that they only made money when investors made money.

4.      Unbeknownst to investors, Defendants only earned money if investors made large deposits and then *lost* their trades.  Defendants thus had but one goal in mind for investors who opened accounts at their broker firms: to convince those investors to continue depositing more and more cash into their accounts and cause them to lose their money by trading binary options.  The Bloombex Brokers in fact typically refused to permit investors to withdraw their money.  Despite the assurances on the websites and the promises made by the call centers, investors depositing money for trading typically lost all of their money.  And Defendants, the Bloombex Brokers, and the call center employees all knew this would be the result.

5.      Defendants also misappropriated millions of dollars of investor deposits by, among other things, sending investor money to Shraga Holdings, Ltd. and Lembex Global Investments, Ltd. (collectively the "Relief Defendants"), entities owned and controlled by Gil Beserglik.  Gil Beserglik sent millions of these dollars to his son, Raz Beserglik.  Defendants sent millions of dollars of investor money to companies owned and controlled by Defendant Petersen as well.

6.      As a result of this conduct, Defendants were able to procure millions of dollars in investor deposits by fraud.  Defendants' entities solicited tens of thousands of investors in the United States, in particular; and thousands of investors in the United States opened binary options trading accounts and deposited millions into accounts controlled by Defendants.  Many U.S. investors lost hundreds of thousands of dollars, and many lost their entire retirement and life's savings.

7.      As a result of this conduct, Defendants violated the antifraud provisions of Sections 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 77q(a) and 15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b–5].  Defendants are liable directly for these violations and as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].  Defendants' offerings of binary options also violated the registration provisions of Sections 5(a) and 5(c) of the Securities Act [15

U.S.C. §§ 77e(a) and 77e(c)].  Defendants are also liable under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting violations of Section 10(b) of the Exchange Act (and Rule 10b-5) and Section 17(a) of the Securities Act.

8.      To deter additional fraudulent activity, and recover fraudulently obtained funds, the SEC seeks civil monetary penalties as well as remedial ancillary relief, including Defendants' disgorgement of ill-gotten gains, prejudgment interest on ill-gotten gains, a civil injunctive order against further violations of the federal securities laws, and other appropriate relief.  Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged herein.

## JURISDICTION AND VENUE

9.      The SEC brings this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)].  Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint, including by making use of the Internet to offer securities and sending or receiving interstate email and participating in interstate voice or video calls.  This Court has subject matter jurisdiction under Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d) and 27 of the Exchange Act [15 U.S.C.§§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

10.     Venue is proper in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  Venue is also proper in this district under 28 U.S.C. § 1391(c)(3), as each of the defendants resides outside of the United States and therefore venue is proper in any district court.

**DEFENDANTS**

11.   **Kai Christian Petersen**, age 52, resides in Germany.  Along with Raz and Gil Beserglik, Petersen owned and operated the Bloombex Brokers.  Petersen also directly or indirectly owned and operated the three telephone call centers that solicited investors to open binary options trading accounts.

12.   **Raz Beserglik**, age 33, is a citizen of Israel.  Along with Petersen and Gil Beserglik, Raz Beserglik owned and operated the Bloombex Brokers.  He also was the Chief Executive Officer of the Bloombex Brokers' main call center in Israel.

13.   Defendant **Gil Beserglik**, age 63, is a citizen of Israel who resides in Germany.  Along with Petersen and Raz Beserglik, Gil Beserglik owned and operated the Bloombex Brokers.  Gil Beserglik is Raz Beserglik's father.

**RELIEF DEFENDANTS**

14.   **Shraga Holdings, Ltd. ("Shraga")** is a company domiciled in the British Virgin Islands and beneficially owned by Gil Beserglik.

15.   **Lembex Global Investments,** Ltd**. ("Lembex")** is a company domiciled in the British Virgin Islands and beneficially owned by Gil Beserglik.

**FACTS**

**I.   BINARY OPTIONS GENERALLY**

16.   Binary options are financial instruments with a value tied to the price of other financial assets, including securities or securities indices.  An investor chooses whether the underlying asset's price will be above or below a certain price at a particular time (*e.g.*, will Apple stock be above $100 per share at 1 p.m. on a particular day).  The options are considered "binary" because they carry only two possibilities: the investor whose prediction is correct makes money (typically receiving back 170 to 180 percent of the amount invested); the investor whose prediction is incorrect loses all or nearly all the investment.

17.   Given this all-or-nothing payout structure, binary option contracts are also sometimes referred to as "all-or-nothing options" or "fixed-return options."

COMPLAINT                              5

Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset —instead, it is "cash settled."

18.    Binary options referencing a security or securities within the meaning of Section 2(a)(1) of the Exchange Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] are themselves "securities" within the meaning of those provisions.

19.    Binary option brokers like those operated by the Defendants derive their revenue and profit from being the counterparty to losing customer trades and retaining the customers' losses.  In other words, binary option brokers have a keen interest in having their customers make large deposits and then to lose that money trading binary options.  Given the payout structure outlined above (e.g., 70 percent return if correct and 100 percent loss if incorrect) and assuming a 50 percent win rate, investors trading over a long enough period of time will lose all of their investment.

20.    To survive long-term, binary option brokers like those owned and operated by Defendants require three things: (i) that customers make deposits and actively trade; (ii) that the trading is unsuccessful (i.e., customers lose money to the broker); and (iii) a constant stream of new deposits from existing and new investors.

## II.    DEFENDANTS' BINARY OPTION SCHEME

21.    During the Relevant Period, Defendants owned and operated three binary options brokers—(a) Bloombex Options, (b) Starling Capital, and (c) Morton Finance—that offered and sold security-based binary options over the internet to customers in the United States and around the world.

22.    The Bloombex Brokers offered and sold binary options referencing securities, including those of Amazon, Google, Nike, Coca Cola, Citi Group, Apple, IBM, Microsoft and numerous other domestic and international companies.  They also offered and sold binary options referencing domestic and international securities indices, including the Nasdaq Composite and Dow Jones Industrial Average.

23.     The Bloombex Brokers operated from the following Internet domains, which were accessible from the United States during the Relevant Period:

> a)     Bloombex Options (www.bloombex-options.com);
>
> b)     Morton Finance (www.mortonfinance.com); and
>
> c)     Starling Capital (www.starlingcapital.com).

24.     The Bloombex Brokers functioned through a web of international corporations controlled by the Defendants.  The Bloombex Brokers' day-to-day activities took place through three telephone call centers owned directly or indirectly by Petersen: (a) TS Trading Services, GmbH (a German corporation); (b) MI6, GmbH (a German corporation); and (c) Five Stones Monopoly Marketing, Ltd. ("Five Stones" and an Israeli corporation) (collectively the "Call Centers").  Petersen managed the two German call centers, and Raz Beserglik managed the Israeli call center, the largest of the three.  The Call Centers solicited investors to open and fund binary options trading accounts, and encouraged investors to use those funds to trade binary options, including binary options referencing securities.

25.     Corporations owned and controlled by Gil Beserglik, through nominees, opened bank accounts to receive and hold investor deposits, to make payments associated with running the scam, and to transfer profits derived from the scheme to Defendants.  These corporations—which are identified as the operators of the Bloombex Brokers' on iterations of the brokers' websites—also technically acted as the counterparty to investors' binary option trades.  In other words, these companies profited when investors lost money, owed investors' money when the investors placed winning trades, and were responsible for paying investors the amounts reflected in the account balances shown on the Bloombex Brokers' websites.

26.     The Bloombex Brokers, and Raz Beserglik in particular, found many investors through affiliate marketers that they knew used false and misleading advertising materials—including spam emails, infomercial-like videos, and websites—to lure investors to the brokers' websites.  The Bloombex Brokers paid the

affiliate marketers a commission for every customer who opened and funded a binary options trading account after viewing the affiliate marketer's fraudulent advertising.  Once the affiliate marketers fraudulently drew investors to the Bloombex Brokers' websites, the Bloombex Brokers used additional deceptive and misleading tactics to obtain as much of the investors' money as possible.

## A.  Deceptive Websites

27.    Opening and trading in an account at the Bloombex Brokers occurred through their websites.  The trading engine embedded on the websites created the appearance of actual market-oriented options trading that looked similar to what an investor would see on a legitimate broker's website.  The trading engine allowed investors to place "trades," see "live" market quotations, make deposits, and track their trades and balances.  The trading engine referred to binary options positions as "assets" or "investments" and, in the case of securities-based options, showed the corporate logos of the companies the positions referenced.

28.    But investors were not purchasing real financial assets from any real market and were not trading with other investors.  Instead, investors were actually trading against the Bloombex Brokers, who profited when the investors lost their trades.  The so-called trades and investments reflected on the investors on-line account statements were simply book entries reflecting positions facing the Bloombex Brokers.  Bloombex Brokers offered, recommended, and sold binary options to investors without disclosing that the brokers profited when investors lost money trading the binary options they offered, recommended, and sold.

29.    Additionally, information on certain pages within the websites that showed an investor his or her account balances falsely stated that investor funds were held in segregated accounts.  The Bloombex-Options website further stated:

> "Client's funds are held in a segregated account. Funds are used only for trading options through our website upon client's instructions and are never used for any other cause. Our liabilities and exposures are professionally handled and we guarantee payouts of your profits based on our terms"

COMPLAINT                                    8

In reality, investors' deposits were comingled and used to pay the Bloombex Brokers' expenses, and Bloombex Brokers seldom allowed "payouts."

30.    The investors' purported account balances did not reflect segregated accounts that could be withdrawn.  Instead, and unbeknownst to investors, these balances reflected underfunded financial obligations of the Bloombex Brokers.  The Bloombex Brokers did not have the funds necessary to cover the liabilities they owed to investors because, contrary to the disclosure above, the Bloombex Brokers used investor money to cover their expenses.  These expenses included referral fees paid to affiliate marketers, fees to the Bloombex Brokers platform providers, commissions for Call Center employees, website hosting and maintenance, and credit card processing fees.  The undisclosed disparity between the liabilities the Bloombex Brokers owed to investors and their actual bank account balances revealed that the Bloombex Brokers were unable to return funds to all of their customers.

31.    The Bloombex Brokers' websites also falsely stated that trading binary options would be profitable, that the Bloombex Brokers were there to help, and that they wanted investors to succeed in making money.  For example, at various times the websites made the following misrepresentations:

> Bloombex Options offers access to one of the world's most profitable trading solutions, accompanied by a dedicated team of financial experts ready to assist you at every step on your way to success.

> * * *

> Trading at Starling Capital is as simple as it can be, thanks to one of the most intuitive platforms on the market and a team of Account Managers eager and available to guide you through the best strategies and the most profitable techniques to get your share of the Financial Markets.

> * * *

> Over the years Morton Finance has enriched the life of thousands of investors, empowering them to achieve their financial goals. We don't just serve customers – we create power traders.  Interested?

COMPLAINT

32.    These statements were false and misleading because investors depositing funds with the Bloombex Brokers generally lost their money, the call center employees generally had no financial training or background, and the Bloombex Brokers actually wanted investors to lose their binary options trades.

**B.    Fraudulent Call Center Operations**

33.    Shortly after registering their binary options trading accounts on one of the Bloombex Brokers' websites, customers typically heard from the Call Centers, which operated as boiler rooms where sales persons used high-pressure sales tactics to offer and sell speculative and fraudulent binary options securities to investors.  Call Center employees were incentivized to fraudulently induce investors to deposit additional funds to trade binary options and to prevent withdrawals because their commissions were based on the amount of net deposits they obtained from investors.

34.    The Call Centers—which at their height collectively employed as many as 200 people—and their employees were tasked with convincing investors to deposit as much money as possible into their trading accounts, getting investors to trade, and eventually helping investors lose those funds.  Employees received training on how to deceive investors from written scripts riddled with false and misleading statements, verbal instructions, and examples of recorded calls with in which salespersons made false and misleading statements to persuade investors to open trading accounts.  These materials were intended to help salespersons build rapport with clients, learn about the size and location of their assets, and convince them to move those assets— including retirement accounts—into their accounts with the Bloombex Brokers.

35.    Call Center managers who reported to Petersen or Raz Beserglik closely monitored the salesforce's efforts.  Some managers wore headsets to monitor calls and advised salespersons in real-time how to overcome investors' resistance to depositing money.  In some cases the managers instructed salespersons to hang up when an investor was being difficult.  Managers held meetings before shifts to discuss recent tactics that successfully resulted in new deposits.  The managers also

COMPLAINT                                          10

set and monitored weekly deposit targets and required some salespersons to stay at work until meeting those targets.

36. Investors typically deposited money into their Bloombex Brokers accounts by credit card and bank wire. Credit card payments were forwarded to bank accounts held by companies created by Gil Beserglik named Bloombex, Ltd. (incorporated in Dominica, "Bloombex Dominica") and Chromex Capital, Ltd. ("Chromex"). The Call Centers typically instructed investors to send bank wires to the Bloombex Dominica and Chromex accounts. Typically, the Bloombex Dominica account received deposits for Bloombex Options and the Chromex account received deposits for Starling Capital and Morton Finance.

### i. The Conversion Desk

37. The first calls to investors typically came from the Call Centers' "conversion desk" ("Conversion"), the group of employees responsible for convincing new customers to make an initial deposit. Conversion employees routinely initiated up to 200 calls per day, reaching 30-60 customers, and generally resulting in three to eight funded accounts daily.

38. From the outset, these sales calls were replete with false and misleading statements. As directed or endorsed by Petersen and Raz Beserglik, the salesforce used aliases instead of their real names. Indeed, many employees in the Call Centers did not even know the real names of their coworkers.

39. Call Center employees were also directed to fabricate their titles, choosing ones normally associated with legitimate trading and the provision of financial advice. For example, even though they typically had little or no relevant experience, salespersons called themselves "Senior Brokers," "Head Brokers," "Analysts," "Senior Trading Advisors" or "Senior Financial Advisors."

40. Salespersons falsely told customers that they had years of trading experience. Additionally, with Petersen and Raz Beserglik's knowledge and at their direction, salespersons lied about their locations, claiming, for example, they were

calling from Stockholm or London, instead of their actual locations in Germany or Israel.  The Call Centers used voice-over-Internet-protocol (VOIP) phones and telephone numbers local to the United Kingdom to convey the impression that the salesforce was located in that country.

41.    In initial calls to customers, Conversion also claimed that to generate meaningful profits investors needed to deposit more than the minimum amount of $250-$500.  Conversion often pushed investors to make initial deposits of $2,000 or more with statements like "the more you invest the more profits you can make."

### ii.    The Retention Desk

42.    Once investors made their initial deposit, the Call Centers' "retention desk" salespersons ("Retention") assumed the relationship.  Retention—which also used fabricated titles like "Broker" and "Financial Adviser"—continued the practice of lying about their real names, relevant business experience, and location.

43.    The Conversion and Retention salesforce also employed a "bait and switch" tactic with investors who opened their accounts after watching fraudulent affiliate marketing videos and expected to profitably trade using computer software. The software the campaigns advertised did not exist.  Instead, affiliate marketers used the promise of this nonexistent software as a lure to trick investors into visiting the Bloombex Brokers' websites and registering a binary options trading account.

44.    As described below, Raz Beserglik worked directly with affiliate marketers using these types of fraudulent materials "make money funnels" to lure investors to Bloombex Brokers' websites.  Raz Bererglik knew or recklessly failed to know that these marketing materials were false and misleading.  Once investors registered, training materials authored by Kai Petersen instructed salespersons to urge investors not to rely on the advertised software, but to instead let the Call Centers' supposed "Brokers" and "Financial Advisers" guide their binary options trading.

45.    The salespersons often claimed the software did not work that well (or at all) and that investors had a greater chance of trading successfully working with the

Bloombex Brokers' traders.  For example, one script authored, edited or approved by Petersen advised salespersons to "Immediately move [investors] away from the bot.," Another instructed them to make the following false and misleading statements:

> "Software: Do you have any experience using this particular software? The reason I ask is because in my opinion, there is no such thing as a successful algorithm-based software for the financial market… And there will never be one. Understand _____?
>
> Listen _____, it's not my job to talk bad about third party software, but they haven't worked in well over a year unless you have experience in the market and you know exactly when to turn it on and off. Does that make sense _____?
>
> This is why I'm here; to help my clients become successful. Trading Binary Options requires strategic timing, knowing when to trade and when not to trade. I mean if you're a surfer and there are no waves, you won't go surfing, right?
>
> The problem with the software is that it doesn't know when something is going on (ex: Brexit, NFP, elections) so it just keeps on placing trades all day and that's what we would call unnecessary risk, wouldn't you agree?"

46.    On-going personal interaction gave Retention—who were also compensated based on investor deposits and penalized for investor withdrawals—repeated opportunities to earn the investors' trust and solicit additional deposits.

47.    Retention also used additional manipulative and deceptive practices and additional false and misleading statements to elicit further deposits.

### (a)    False and Misleading Statements to Customers

48.    ***Alignment of Interest***.  Retention told investors, in substance, "We only make money when you make money."  One script authored, edited, or approved by Petersen instructed salespersons to falsely state:

> Senior Account Managers at Morton Finance/ Starling Capital work on something called ROI. Are you familiar with the term? No?  ROI means Return On Investment.  What this means is that I can see profits in my paycheck ONLY when you withdraw profits to your personal bank account or your credit card [. . . .]  Do you understand?  Can you see why this is good for you?  Because what this means is that I need to

support you making profits for me to get paid at the end of the month. Both our interests are fully aligned and we work as a team.

49.     In reality, Retention employees profited from investor *losses*, not profits. In addition, their commissions were based on customers' net deposits, which encouraged salespersons to use deceptive tactics to obtain the largest deposits possible and discourage or prevent customers from making withdrawals. This statement also conflicts with the Call Centers' policy to provide investors bonuses (described below) to lock up their funds to prevent withdrawals.

50.     ***Withdrawals***.  Retention falsely told investors that they could withdraw funds any time from their accounts.  The Bloombex Brokers' websites also described the ease of withdrawing funds.  For example, the Bloombex-Options website stated: "Your withdrawals can be received just as efficiently.  You can transfer the funds into your account in the currency that you choose, and in the secured method which is most convenient for you.  Your funds will be received in a short time period."  The Morton Finance website stated "Withdrawals can be made fast and easy."

51.     In fact, the Call Centers rarely allowed investors to withdraw funds. Employees used numerous tricks—including recommending that customers enter into long-term trades and accept bonuses (described below)—to lock up investor funds and prevent withdrawals.  In other instances, Call Center employees simply ignored withdrawal requests or lied about why withdrawals were not received as promised. Only Raz Beserglik and Kai Petersen could approve withdrawal requests.

52.     ***Promises of profitable trades.***  Retention typically urged investors to liquidate their other financial accounts, including retirement accounts, because they could achieve greater returns trading binary options.  In one script, sales persons were advised to state: "Most of my clients are withdrawing profits of anywhere between $5,000 and $9,000 every month."  Another script told sales persons to say "Don't worry _____, 75% of my clients had no trading experience when they started and now they are ALL trading successfully."  Such statements lacked any basis, as

salespersons knew that investors usually lost money trading and typically could not withdraw funds from their accounts.

53.    ***Elevation to "VIP" status***.  Retention routinely told investors that if they increased their total deposits—usually to the five- and six-figure range —they would achieve "VIP," "gold," "platinum," or some similarly-named elevated status that provided access to more experienced brokers, larger bonuses and payouts, and access to special VIP-only opportunities.  The Bloombex Brokers' websites also described these tiers and so-called benefits.  In a recorded call, a salesman used this tactic and told one investor that increased deposits would qualify him to join a select group of traders making $8,000-$10,000 per month.  In reality, there were no real benefits to the so-called "VIP" status and it was merely a trick to lure more and larger deposits.

### (b)    Deceptive tactics and manipulative devices designed to obtain additional investor deposits

54.    In addition to making false and misleading statements, Retention used deceptive tactics that tricked customers into depositing additional funds.

55.    ***Confidence Trades and Withdrawals***.  The Bloomberg Brokers increased the odds of customers winning initial small-dollar trades to boost their confidence (including through manipulation of risk settings, as described below) and convince them to deposit more money to make larger trades.  The Bloombex Brokers also permitted some investors to make relatively small withdrawals to boost their confidence that they could later withdraw larger dollar amounts.  If investors asked for sizable withdrawals or said they had no more money to deposit, the Bloombex Brokers typically refused further withdrawal requests.

56.    ***Contrived Urgency.***  To create a sense of urgency and encourage investors to make additional deposits, salespersons routinely told investors of supposed imminent market events that would result in profitable trading but only if they acted immediately.  Bloombex Brokers' training materials stated "you need to create urgency at the beginning of the call" and defined "urgency" as "giving the

client a reason to proceed today and not tomorrow."  Consistent with this training, salespersons cited upcoming earnings announcements by well-known public companies such as Apple or Amazon or expected public disclosures of economic news, such as the jobless rate.  But the salesforce knew nothing about how such events would impact stock prices.  Instead, citing such events was simply a high-pressure sales tactic to trick customers to make the additional deposits necessary to take advantage of a contrived trading opportunity.

57.    ***Bonuses.***   To encourage large deposits, salespersons frequently promised investors a matching "bonus" for every dollar deposited, *e.g.*, investors who accepted a "bonus" and deposited $50,000 would see an additional $50,000 "bonus" deposited in their accounts.  Indeed, the "VIP" programs described above often touted such bonuses (and other schemes akin to bonuses like "Risk Free Trades").  Investors were often not told, however, that bonuses came with attached conditions that made it all but impossible to withdraw any of their funds, including non-bonus money.

58.    The Bloombex Brokers required investors receiving a bonus to conduct trades equivalent to many multiples of the bonus amount—*e.g.*, 27 times.   Under this multiple, an investor who deposited $50,000  and received a $50,000 bonus would need to conduct trades valued at $1,350,000 before he or she could withdraw any funds, including funds previously deposited that did not have any bonus attached.  The bonuses locked up investors' funds, forcing them to trade large amounts to make their account liquid.  Given the payouts on winning and losing binary options trades, trading profitably at such volumes was extremely difficult.

59.    Scripts discussing bonuses omitted any discussion of these withdrawal restrictions.  For example, one script authored or edited by Petersen stated as follows:

> Great, _____; that's why I want to set you up with a program we have for beginners such as yourself. It's called the Protected Capital Program. Do you know what it means? No? but the name kind of gives it away, doesn't it?

Let me ask you this _____: when you have money in your bank account, what kind of interest are you receiving? Yeah, it's pretty sad, isn't it? Your money is sitting in the bank collecting DUST for you, while your bank makes DOUBLE-DIGIT PROFITS off YOUR MONEY!!! The difference between your bank and Morton Finance/ Starling Capital is that, as a Private Investment Institute (never use the word bank) you can enjoy what we call "Beginner's Benefits". The immediate interest/ bonus we give you is 100% (… Pause…) That's a dollar-for-dollar match!!! Just so you understand me perfectly, when you start with $10,000, Morton Finance/ Starling Capital will IMMEDIATELY add $10,000 to your account as interest/ bonus.

Now, in the protected capital program that we're talking about, for the first 30 days, trades will only be placed using the interest/ bonus money to show you what kind of results we can obtain together. Basically, we're putting you in a WIN-WIN situation because the trading will happen with OUR money, showing you some amazing result, all the while leaving YOUR money completely unexposed!

You might be asking yourself "why" Morton Finance/ Starling Capital would do such a thing as give you an additional 10K. It's not because we are nice… It's just good business sense. We understand that in this business, the most important thing is TRUST. And we need to build your trust. We are SO comfortable in our ability to provide profitable trades that we are willing to put you in this WIN_WIN situation for the first 30 days. Like this, you can see with your own eyes how good we are, and how much profit we can generate together.

Once you see the results, and the profits we generate here, that's when we will have gained your trust and you will become one of the happy, profitable long-term customers of our tight-knit family.

60.     The Bloombex Brokers had the bonus conditions on their website; but, these disclosures were typically deeply embedded and only available if investors clicked the correct link and read long boilerplate disclosures.  The Bloombex Brokers also sometimes disclosed these bonus-withdrawal rules in written bonus agreements provided to investors.  But concealing the bonus-withdrawal rules from investors was a deliberate tactic discussed in daily strategy sessions with management.  Retention often failed to highlight or otherwise mention these rules to customers.  Consistent with the tone of the scripts above, other investors were told by Call Center employees

COMPLAINT                                   17

— *e.g.*, the customers' so-called Brokers or Financial Advisers — not to worry about the turnover requirement because it would be easy to meet. Email and banner advertisements touting the bonuses also did not disclose these conditions. And as discussed above, far from explaining these bonus withdrawal rules, salespersons often told investors that they could withdraw funds at *any* time.

61. ***Risk Settings***. The Bloombex Brokers could manipulate the odds that particular trades would be profitable. They put certain customers on a lower risk setting (which made winning trade more likely) to induce them to make additional deposits. Once an investor stopped making deposits or won large amounts in trading, the brokers put the investor on a higher risk setting, making it more difficult to profit.

62. For example, in one email from July 2015, a Bloombex Options Call Center representative emailed SpotOption, its platform provider, saying: "Client won last 10 trades in a row in the 60 seconds platform. Please put this client on a high risk." In another instance, a representative wrote: "Please put trader on high risk, started winning big ladder trades." In some instances, Raz Beserglik (using his alias "Jack Besser") personally requested SpotOption to change investors' risk setting.

63. The use of risk settings is especially manipulative when investors' funds are locked up as a result of bonuses or a failure to honor withdrawals. For example, investors could accept the bonus under favorable risk settings and, after their funds were locked up, could then be unknowingly forced to trade under higher risk settings that made profitable trading all but impossible.

64. ***KYC:*** Under the guise of "know-your-customer" diligence, salespersons were trained to ask investors about their financial goals. They asked questions like: Did the investor seek to earn enough money from trading binary options to cover a mortgage payment, or pay off credit card debt or other loans or help pay down a deposit for a new home? Such questions—seemingly for the customers' benefit— were actually designed to have the customer reveal their financial condition and the dollar amount and location of additional funds that salespersons then targeted. The

Bloombex Brokers also used KYC rules to justify requiring customers to submit photos of their credit cards, drivers' licenses, and a utility bill.  In truth, they actually sought these documents to dispute credit-card chargebacks and fraud allegations.

65.  ***Credit Loop***:  Salespersons also employed a so-called "credit card loop" scheme, where they encouraged investors to borrow the maximum amount on their credit cards for short-term binary options trading.  Under the "loop," investors were supposed to withdraw their profits and pay off the credit card debt before the next billing cycle.  Salespersons pitched the "loop" as essentially an interest-free loan to fund binary options trading.  When the time to repay the credit cards arose, however, the Bloombex Brokers typically refused to permit the investor to withdraw funds.

### (c)    The "Recovery" Department

66.  Once investors lost the money they deposited with the Conversion and Retention desks, they were turned over to the "Recovery" department, whose goal was to convince investors to make additional deposits.

67.   Training materials instructed Recovery agents to give investors hope they could recover their losses by working with new people at the Bloombex Brokers.  The materials directed Recovery agents to call investors and say things like "I am calling today because I have a chance to recover your account."  They were told to introduce themselves as a "higher authority," such as a manager or head of department.  The training materials further instructed Recovery agents to express disappointment with the investor's prior results or account condition, adding: "The key is to always explain how this time will be different."

68.  Statements made by Recovery agents were false and misleading, as Recovery made no genuine effort to recover lost investor funds — indeed it was not in their interest to do so.  Instead, the Recovery pitch was merely another deceptive device aimed at stealing whatever money investors had left.

69.  The false and misleading statements and deceptive acts employed by the salesforce in Conversion, Retention and Recovery occurred with the full knowledge

COMPLAINT                                     19

of, and at the direction of, Petersen and Raz Beserglik.  Several scripts provided to Bloombex Brokers' Call Center employees-in-training—including scripts authored, edited or approved by Petersen and/or Raz Beserglik—contained statements similar to those described above.  The salesforce made misrepresentations that closely followed the scripts and training materials.

70.     Petersen and Raz Beserglik each supervised the Call Center locations, interviewed and hired employees, and were responsible for seeing that employees were paid (in their actual names).  Petersen regularly reviewed and edited documents reflecting employees' names and aliases.  Raz Beserglik regularly received email messages reflecting the use of fictitious names and titles.  Raz Beserglik himself used a fake name when conducting the business of the Bloombex Brokers.

## C.     A Case Study: A U.S. Retiree

71.     The Bloombex Brokers used recorded telephone calls to train Call Center employees how to successfully solicit funds from investors.  Recorded calls between a particular retiree in the United States ("Investor A") and a Bloombex Options salesman ("Employee A") illustrate the nature of the Call Centers' egregious misconduct and the type of calls that were used to train Call Center employees.

72.     Investor A had already deposited $2,000 in her binary options account when Employee A contacted her in about August 2015.  In a series of phone calls over the next approximately six months, through at least February 2016, Employee A persistently used fraudulent statements and deceptive devices, consistent with the Bloombex Brokers' training materials, to solicit additional deposits from Investor A.

73.     He falsely told Investor A that he worked in Bloombex Options' London office and was a "financial adviser" for more than 12 years.  He falsely said he only trades on "major" economic events, and described the next week's scheduled announcement of "core retail sales" as "one of the largest events in the U.S. economy."  He falsely told Investor A that their interests were aligned, saying "I need my traders to be successful for me to make my money."  Employee A falsely told

Investor A that people at Bloombex Options were making "50 percent a month," but that he opted to be more conservative and instead offered Investor A a 15-20 percent profit per month.

74.    Employee A recommended the "credit card loop" scheme, in which Investor A would borrow money on her credit card accounts to conduct short-term binary options trading. Employee A also stated that Investor A would receive a dollar-for-dollar bonus for new deposits without disclosing the attached conditions.

75.    Employee A also schemed to learn about Investor A's assets, asking if she had a "magic number target" for trading or "any major debts that we need to clear off the bat?" Investor A eventually disclosed that she had no debt and approximately $600,000-$700,000 in savings. Investor A emphasized that she did not want to invest all of her savings and that she was seeking to generate about $300,000 in profits to cover the cost of building a new home.

76.    Employee A repeatedly told Investor A she needed to deposit more funds to reach "VIP level," falsely saying that such status would provide "class A signals on the top-tier trades." Employee A relentlessly pushed Investor A to deposit money, saying she was "close" to attaining VIP status and that she could generate more profits from trading binary options than she was earning in other accounts.

77.    At one point, Employee A sternly directed Investor A to liquidate an insurance fund and transfer those funds to her binary options account. When Investor A said she needed to withdraw $100,000 from her account to cover medical expenses, Employee A turned the tables and instead convinced Investor A to deposit still additional money that would generate "a guaranteed return of 62 percent," which Investor A could then use to pay those expenses.

78.    At Employee A's urging, Investor A deposited more than $600,000 with Bloombex Options. She lost most or all of these funds.

**D.    The Defendants Owned and Controlled the Bloombex Brokers**

79.    Defendants are longtime business associates who shared ownership and control of the Bloombex Brokers.  Call Center employees understood that Petersen, Gil and Raz Beserglik owned the Bloombex Brokers.  The employees' impression is consistent with the brokers' actual operation and control.

80.    Each Defendant took an active role in operating the Bloombex Brokers.  For example, Petersen and the Besergliks led regular in-person or telephonic meetings to discuss the operation of the Bloombex Brokers.  Among other things, they discussed the operation of the Call Centers, the creation of new brokers/brands, opening bank accounts with apparent nominees, contracting with platform providers, sales and marketing activities, and finances.  Petersen and Gil Beserglik also each loaned money to one or more of the Bloombex Brokers.

**i.    Gil Beserglik**

81.    Gil Beserglik admitted he was an owner of Bloombex Options (one of the Bloombex Brokers).  When Gil Beserglik opened a bank account for Shraga on or about October 15, 2015, he told the bank "[h]e now invests in real estate and is the owner of Bloombex Options with his son Raz Beserglik."  Under the heading "Main business activity" on the account application, it reads "Gil Beserglick [sic] is a partner of Bloombex options [sic]."  The application's personal information form, under the heading "Business activity for the owner," identifies his business as "Bloombex Options www.bloombex.options.com"; his "position/function" as "co-owner with his son"; and the "Ownership structure" as "Family business with son." In the same document, Gil Beserglik also identified Raz Besrglik as the Chief Executive Officer of Bloombex Options.

82.    When the bank updated its documentation in early 2016, it continued to reflect Gil Beserglik's ownership of Bloombex Options.  It also listed the source of funds going into the account as "From Business" – *i.e.* Bloombex Options.  Around this same time, as reflected on the documentation, Gil Beserglik told the bank he

"also owns 'Chromex' a sister company of Bloombex (same employees working for both companies)". Chromex referred to Chromex Capital, Ltd., ("Chromex") a company incorporated in the British Virgin Islands that operated the bank accounts used by Starling Capital and Morton Finance.

83. When Gil Beserglik opened the Shraga account in 2015, he informed the bank that he planned to fund the account with a $2 million transfer from accounts *he* controlled. At Gil Beserglik's direction, Bloombex Dominica then sent $2 million to of Bloombex Brokers investor funds to Shraga. At other times, Beserglik directed Bloombex Dominica to transfer additional investor funds to the Shraga account and another account he owned in the name of Lembex.

84. Beginning in 2016, Beserglik also directed Chromex to send investor funds to the Shraga account.

85. Overall, during the Relevant Period, Gil Beserglik caused the Bloombex Dominica and Chromex accounts to transfer approximately $11 million in investor funds to his Shraga and Lembex accounts. This $11 million came from investor deposits for trading binary options with the Bloombex Brokers.

86. To hide his involvement in Bloombex Brokers, Gil Beserglik controlled Bloombex Dominica and Chromex through a straw person or nominee ("Nominee A") who was a family relative. At Gil Beserglik's direction, Nominee A appears as the initial shareholder and Director of both companies. At Gil Beserglik's direction, Nominee A also opened the bank accounts in these companies' names that accepted investor deposits for Bloombex Brokers. Gil Beserglik, however, directly or indirectly controlled the bank accounts opened by both companies.

87. In June 2018, after becoming aware of an SEC investigation and in a failed attempt to hide the admissions in the bank documents completed in 2015 and 2016 discussed above, Gil Beserglik asked the bank to replace that documentation with new and fraudulent documentation indicating that he sold Bloombex Options in

2014.  In doing so, Beserglik attempted to mislead the SEC's staff and to obstruct its investigation.

88.    Gil Beserglik formed a company in the British Virgin Islands also named Bloombex, Ltd. ("Bloombex BVI") through which he signed the contracts and contract amendments with SpotOption to provide the trading platform on which Bloombex Options operated.  The SpotOption platform was a critical component of the Bloombex Options website and necessary to its offer and sale of binary options.

89.    Gil Beserglik also helped run the Call Centers.  He is listed as "Management" and with a job title "Advisor" on call center telephone lists.  Payroll records from TS Trading Services GmbH (one of the German call centers) show that Gil Beserglik was among its highest paid employees.  Further, Gil Beserglik's 2017 resume says he was a "Registered Manager" for TS Trading Service since 2009.

90.    Gil Beserglik frequently visited the German call center offices.  During those visits, Petersen treated him like an owner, instructing salespersons to "look busy."  While in Germany, Gil Beserglik also monitored activity at Five Stones, the Israel-based call center.  For example, Gil Beserglik used his mobile phone to view activity at Five Stones.  When he saw something that he did not like, he telephoned the call center to correct the behavior or discipline the offending employee(s).

### ii.    Kai Petersen

91.    Petersen was also an owner of the Bloombex Options broker.  In 2015, he signed documents in support of an application for credit card processing on which he represented that he owned the website www.bloombex-options.com and that he had full control and authorization over the website content.  This application said that "Bloombex Options is the on-line trading site for Bloombex LTD."  The Bloombex Ltd. referred to in the application was Cyprus entity owned by Petersen with the same name as the other companies directly or indirectly owned by Gil Beserglik (Bloombex BVI and Bloombex Dominica).

92.     Petersen also directly or indirectly (through intermediary corporations) owned each of the three Call Centers and directed or approved of their fraudulent conduct in inducing customers to deposit funds to trade binary options.   When creating and issuing invoices to Bloombex Dominica and Chromex for services performed at the German call centers, Petersen typically listed himself as "Managing Director" of the relevant call center.  Bloombex Dominica and Chromex each sent millions of dollars of investor money to the call centers owned by Petersen.

93.     Petersen maintained an office in the German call centers and regularly met with trading floor managers.  Petersen was only one of two people permitted to authorize client withdrawals from the Bloombex Brokers (Raz Beserglik was the other).  Petersen also interviewed and hired employees for the German call centers. He often sought to employ native English speakers to serve English-speaking countries like the United States.

94.     Petersen authored or edited numerous spreadsheets reflecting salespersons' real and fake names at all three Call Centers.  These spreadsheets confirm that Petersen knew and approved of the Call Centers' use of false names when talking to investors.  Petersen also created or edited Bloombex Brokers' training materials, including scripts containing false and misleading statements as described above.  For example, a script Petersen authored or edited instructed Call Center employees to make the following false and misleading statements:

- o   My name is _____, and I'm a senior account manager here at Morton Finance/ Starling Capital. My job here is to set financial goals with you on your account so we can support you to achieve these profits on a regular basis.

- o   Most of my clients are withdrawing profits of anywhere between $5,000 and $9,000 every month. So, it seems that you're looking to make about what most of my clients are making. Does that sound right? Perfect!

- o   Both our interests are fully aligned and we work as a team.

COMPLAINT                                25

95.     Another script Petersen authored or edited, instructed Call Center employees to make the following false and misleading statements:

o   Don't worry _____, 75% of my clients had no trading experience when they started and now they are ALL trading successfully.

o   This is why I'm here; to help my clients become successful.

96.     Yet another script and list of "Best Practices" that Petersen authored or edited, instructed employees to make the following false and misleading statements:

o   "We make the profit out of your successful trades. When you make a successful trade, you get 80 % of the profits, we get a commission of 20 %"with a matching bonus"

o   "You are reserving yourself a seat and a call from one of our financial advisors"

o   "I don't recommend clients just to start with the minimum as they will be making less money"

o   "My responsibility is simply to activate your account and assign you to a senior broker: The more you invest, the better senior broker I can assign to you.  They will help you to develop a trade [sic] plan."

97.     These and other similar statements were false and misleading because, *inter alia*, the Call Centers jobs did not involve helping investors profit; virtually no clients (if any) withdrew meaningful profits from any of the Bloombex Brokers; and the interests of the Bloombex Brokers and investors conflicted and were not aligned.

98.     The Best Practices portion of one Petersen script gave the following instructions consistent with the boiler-room-like atmosphere at the Call Centers:

o   "Don't waste any time on the small fishes"

o   "Immediately move away from the bot [the software systems fraudulently advertised by affiliate marketing campaigns]"

o   "Never get a 'no' ➔ don't ask closed questions"

o   "When a client enquires about the music, 'manager's birthday' or 'client just made 50.000 EUR'"

o   "You need to create urgency at the beginning at the call"

The egregiousness of the instructions in these examples confirms that Petersen knew (or was reckless in not knowing) and approved of the Call Centers' use of false and misleading statements and deceptive devices when speaking with investors.

### iii.    Raz Beserglik

99.    Raz Beserglik also owned the Bloombex Brokers and served as the Chief Executive Officer of the Israeli call center, Five Stones.  In this latter role, he was responsible for that Call Center's day-to-day activities.

100.    When conducting business related to binary options, he used an alias, Jack Besser, to conceal his involvement.  As "Jack Besser," Raz Beserglik acted as a control person over the Bloombex Brokers.  He used his alias when completing credit card processing applications, registering the Internet domain for the Starling Capital and Morton Finance websites, and contracting for platform series for Starling Capital and Morton Finance.

101.    Raz Beserglik also represented Starling Capital and Morton Finance in reaching an agreement with their platform provider, and he dealt with that provider and Bloombex Option's platform provider in handling day-to-day activities pertaining to the brokers' operation.  "Jack Besser" also negotiated the commissions paid to affiliate marketers who found potential investors for the Bloombex Brokers, and offered to pay higher amounts in instances when marketers directed U.S. investors to the web sites.  "Jack Besser" also asked SpotOption to adjust the "risk settings" for certain investors who were winning their binary options trades.

102.    Raz Beserglik also directed or approved of the Call Centers' fraudulent conduct in inducing customers to deposit funds to trade binary options.  He drafted or edited scripts used by salespersons at the Call Centers that contained the false and misleading statements, including:

o   Trading with Bloombex is easy, simple and profitable.

o   Bloombex is located in the UK with a local service team in Germany.

o Bloombex is an International binary trading platform that is regulated in Singapore and Cysec that works with customers from all over the world and has been working with these thousands of customers for a number of years now.

103.    These and other similar statements were false and misleading because, *inter alia*, trading with Bloombex was generally not profitable; Bloombex Options had no true presence in the U.K.; and it was not a regulated entity.

**E.    The Bloombex Brokers' Fraud Targeted U.S. Investors**

104.    The Defendants purposefully solicited U.S. investors.  Raz Beserglik (operating as "Jack Besser") worked directly with affiliate marketers to drive U.S. investors to Bloombex Options through false and misleading affiliate marketing campaigns.  In one February 2015 email, he offered to pay an affiliate marketer $400 for each customer in the U.S. who deposited $500 with Bloombex Options.

105.    In another February 2015 email, he wrote to the same affiliate marketer:

"We definitely want USA traffic but I would appreciate as well some Canadians and Australians clients as well - can you make it 70/30?

We have several USA campaigns already using make money funnels and it works for us so far because we have agreed with all our partners (and you can check) to have a $500 minimum deposit for their clients."

106.    Raz Beserglik knew or was reckless in not knowing that the affiliate marketers' use of "make money funnels" was false and misleading.  Specifically, he knew or was reckless in not knowing such affiliate marketing materials drew investors to binary options websites with promises of making money on the Internet and trading software that would generate profits trading binary options.  He also knew or was reckless in not knowing that the investors such materials recruited to binary options brokers like the Bloombex Brokers were highly unlikely to ever make any money trading binary options.

107.    Certain scripts prepared for the salesforce show that the Bloombex Brokers knowingly solicited U.S. investors.  One such script authored, edited or approved by Petersen, instructed salespersons to say:

> Now, _____, **I can see that you're from the States; what part of the States are you from?**  Really? Make some remark about that part of the states that you know or something to create rapport with the client.  I'm originally from …_____... Have you ever been there? It's definitely worth a visit.

108.    In June 2015, Bloombex Options purportedly decided to stop accepting customers from the U.S. until it finished setting up a new broker specifically intended to solicit U.S. business, but then immediately reversed its decision because of the high volume of U.S. investors.  In an email, the head of marketing wrote, "Due to the sheer volume of traders from the US, management has decided to keep accepting all US traders until the second brand is fully complete, up and running.:"  Defendants later opened Morton Finance and Starling Capital in order to target U.S. investors.

109.    Defendants each knew that many of their customers were U.S. residents. The know-your-customer records that the Bloombex Brokers collected from investors—including drivers' licenses, copies of bills, credit card images, and passports — clearly identified many investors as United States residents.

**F.    Defendants' Conduct Resulted in Millions of Dollars of U.S. Investor Losses**

110.    From 2012 through 2016, Bloombex Options received about $80 million from investors worldwide, including investors in the United States.  A significant percentage of these deposits were from investors in the United States.  Morton Finance records reflect that by September 2016, more than 8,000 U.S. investors had deposited more than $14,775,000, while Starling Capital records reflect that it had more than 2,700 U.S. investors who deposited nearly $3 million.  However, these two brokers continued accepting investor deposits for another full year and for the

remainder of the Relevant Period, until at least August 2017, earning an estimated $100 million or more over the Relevant Period through sales of binary options.

111.    Many investors made at or near the minimum required deposits, generally around $500.  Dozens of investors deposited sums reaching five, six and even seven figures.  These latter victims included disabled persons, doctors, farmers, and numerous retirees and pensioners who lost their life's savings as a result of the Defendants' fraudulent statements and scheme.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a)(1), (2) and (3) of the Securities Act
### (All Defendants)

112.    Paragraphs 1-111 are realleged and incorporated by reference herein.

113.    Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a) employed devices, schemes, or artifices to defraud;

(b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser of such securities.

114.    Kai Christian Petersen, Gil Beserglik and Raz Beserglik each knew, or were reckless in not knowing, that he employed devices, schemes and artifices to defraud.  Kai Christian Petersen, Gil Beserglik and Raz Beserglik each knew, or were reckless or negligent in not knowing, that he obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

115.   By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c)**
**Thereunder**
**(All Defendants)**

116.   Paragraphs 1-111 are realleged and incorporated by reference herein.

117.   Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a) employed devices, schemes, or artifices to defraud; and

(b) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons

118.   Kai Christian Petersen, Gil Beserglik and Raz Beserglik each knew, or were reckless in not knowing, that he employed devices, schemes and artifices to defraud and engaged in acts, practices or course of business which operated or would operate as a fraud or deceit upon other persons.

119.   By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**
**(Petersen)**

120. Paragraphs 1-111 are realleged and incorporated by reference herein.

121. Petersen, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

122. Petersen knew, or was reckless in not knowing, that he made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances, not misleading.

123. By reason of the foregoing, Petersen violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

**Unregistered Offer or Sale of Securities**
**Violations of Section 5 of the Securities Act**
**(All Defendants)**

124. Paragraphs 1-111 are realleged and incorporated by reference herein.

125. No registration statement had been filed or was in effect with the SEC for any of the security-based binary options offered or sold through the Bloombex Brokers, their Call Centers and Defendants.

126. Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such securities.

127.   By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 5 of the Securities Act [15 U.S.C. §§ 77e].

## FIFTH CLAIM FOR RELIEF

### Control Person Liability Under Section 20(a) of the Exchange Act for the Bloombex Brokers' and Call Centers' Violations of Section 10(b) (All Defendants)

128.   Paragraphs 1-111 are realleged and incorporated by reference herein.

129.   At all times relevant hereto, each of the Defendants was a control person of the Bloombex Brokers and their Call Centers for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], directly or indirectly controlling those operations.

130.   The Bloombex Brokers and Call Centers, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; and thereby each committed violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

131.   Defendants cannot establish that they did not directly or indirectly induce the acts of the Bloombex Brokers and their Call Centers that constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, nor that they acted in good faith.

132.   Defendants are therefore liable as controlling persons under Section 20(a) of the Exchange Act to the same extent as Bloombex Brokers and the Call Centers would be liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SIXTH CLAIM FOR RELIEF

**Control Person Liability Under Section 20(a) of the Exchange Act for The Bloombex Brokers' and Call Centers' Violations of Section 15(a) of the Exchange Act**
**(All Defendants)**

133.    Paragraphs 1-111 are realleged and incorporated by reference herein.

134.    At all times relevant hereto, each of the Defendants was a control person of the Bloombex Brokers and their Call Centers for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], directly or indirectly controlling those operations.

135.    By engaging in the conduct described above, the Bloombex Brokers and the Call Centers: (a) engaged in the business of effecting transactions in securities for the account of others; and (b) directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the SEC or associated with a broker or dealer registered with the SEC; and thereby each committed violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78j(b)].

136.    Defendants cannot establish that they did not directly or indirectly induce the acts of the Bloombex Brokers and their Call Centers that constitute violations of Section 15(a) of the Exchange Act, nor that they acted in good faith.

137.    Defendants are therefore liable as controlling persons under Section 20(a) of the Exchange Act to the same extent as Bloombex Brokers and the Call Centers would be liable for violations of Section 15(a) of the Exchange Act.

## SEVENTH CLAIM FOR RELIEF

**Aiding and Abetting The Bloombex Brokers' and Call Centers' Violations of 10(b) of the Exchange Act**
**(All Defendants)**

138.    Paragraphs 1-111 and 130 are realleged and incorporated by reference herein.

139.   The Bloombex Brokers and Call Centers, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; and thereby committed violations of Section 10(b) of the Exchange Act and Rule 10(b)-5.

140.   Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Exchange Act, or of any rule or regulation issued thereunder, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

141.   Each of the Defendants knowingly or recklessly provided substantial assistance to violations of Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder by Bloombex Brokers and their Call Centers.

142.   By reason of the foregoing, Defendants are liable for violations of Section 10(b) of the Exchange Act and Rule 10(b)-5 by the Bloombex Brokers and their Call Centers to the same extent as each of the Bloombex Brokers and Call Centers would be liable for their own violations and, unless enjoined, will again violate Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder.

## EIGHTH CLAIM FOR RELIEF

**Aiding and Abetting The Bloombex Brokers' and Call Centers' Violations of Section 17(a) of the Securities Act
(All Defendants)**

143.   Paragraphs 1-111 are realleged and incorporated by reference herein.

144.    The Bloombex Brokers and their Call Centers, by engaging in the conduct described above, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; (b) negligently or with scienter, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) negligently or with scienter, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser of such securities.

145.    Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], any person that knowingly or recklessly provides substantial assistance to another person in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

146.    Each of the Defendants knowingly or recklessly provided substantial assistance to violations of Section 17(a) of the Securities Act by Bloombex Brokers and their Call Centers.

147.    By reason of the foregoing, Defendants are liable for violations of Section 17(a) of the Securities Act to the same extent as each of the Bloombex Brokers and their Call Centers would be liable for their own violations of Section 17(a) and, unless enjoined, will again violate Section 17(a) of the Securities Act.

## NINTH CLAIM

### Claims Against Relief Defendants As Recipient Of Investors' Funds

148.    Paragraphs 1-111 are realleged and incorporated by reference herein.

149.    Exchange Act Section 21(d) provides: "[i]n any action or proceeding brought or instituted by the SEC under any provision of the securities laws, the SEC may seek, and any Federal Court may grant, any equitable relief that may be

COMPLAINT                                      36

appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).
Exchange Act Section 27 gives the federal courts jurisdiction over such equitable
claims for relief.  [15 U.S.C. § 78aa.]

150.    Relief Defendants received funds and property from one or more of the
Defendants, which are the proceeds, or are traceable to the proceeds, of the unlawful
activities of Defendants, as alleged in at least paragraphs 5, 14-15 and 81-90 above.

151.    Relief Defendants obtained the funds and property alleged above as part
of and in furtherance of the securities violations alleged throughout this Complaint
and under circumstances in which it is not just, equitable or conscionable for them to
retain those funds and property.  Relief Defendants have thus been unjustly enriched.

## **RELIEF REQUESTED**

WHEREFORE, the SEC respectfully requests that this Court:

a)      Find that Defendants committed the alleged violations;

b)      Order Defendants to disgorge, with prejudgment interest, all ill-
gotten gains they received or derived from the activities set forth in this
Complaint, and to repatriate any ill-gotten funds or assets they caused to be sent
overseas.  Order Relief Defendants to disgorge, with prejudgment interest;

c)      Order Defendants to pay civil penalties under Section 20(d) of the
Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15
U.S.C. § 78u(d)(3];

d)      Permanently enjoin Defendants from directly or indirectly violating
Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e & 77q(a)] and
Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-
5 thereunder [17 C.F.R. § 240.10b-5];

//
//
//
//
//
//

COMPLAINT

e)    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

f)    Grant such other relief as may be necessary or appropriate.

Dated:  September 26, 2019                    Respectfully submitted,

*/s/ KENNETH W. DONNELLY*

_____
Kenneth W. Donnelly
Attorney for Plaintiff
Securities and Exchange Commission

COMPLAINT                                      38